UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
RORY DOLAN,

                    Petitioner,          <u>MEMORANDUM & ORDER</u>
                                         06-CV-5891(JS)

          -against-

JOHN J. DONELLI,

                    Respondent.
----------------------------------X
APPEARANCES:
Petitioner:          Rory Dolan, <u>Pro</u> <u>Se</u>
                     95-A-2656
                     Fishkill Correctional Facility
                     P.O. Box 1245
                     Beacon, NY 125

For Respondent:      Anne E. Oh, Esq.
                     Suffolk County District Attorney's Office
                     200 Centre Drive
                     Riverhead, NY 11901

SEYBERT, District Judge:

          Petitioner, Rory Dolan ("Dolan" or "Petitioner"),

petitions the Court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.   His Petition raises nineteen discrete

constitutional arguments.   For the reasons discussed below, the

Petition is DENIED.

<u>BACKGROUND</u>

I.   <u>Factual Background: Commission Of The Crimes And
     Investigations</u>

     On the morning of November 17, 1988, Petitioner raped Mary

Jean Sherin.

     Brandishing a knife, he forcibly entered her home with a

pillowcase cloaking his facial features.   It was approximately 8:30

a.m. Sherin resisted; Dolan slashed her, slapped handcuffs on her
wrists, and shoved her to the ground.  His first objective was to
locate Sherin's money.  After dragging Sherin to her sons' bedroom,
he ordered her to produce her checking card and PIN number.  She
replied – truthfully – that she did not use one.  Questioned about
money secreted away in the house, she disclosed the location of
$900 cash, prompting Dolan to go in search of it.  (T2. 3105-11.)[1]

While Dolan searched outside of Sherin's presence, Sherin made
a move to escape.  At that instant Dolan barreled back into the
room, threw her to the floor between her sons' beds, and threatened
to murder her if she should move again.  With Sherin lying face
downward, Dolan removed her nightgown and traced the knife down her
back.  He then demanded to know where she stored her jewelry.  So
informed, he briefly exited the room.  (T2. 3111-16.)

On reentering he blindfolded and raped Sherin.  (T2.
3115-16.)

After he had completed the act he bound together her arms
and legs with a jump rope and cord; soon thereafter he left, but
not before informing Sherin that he was en route to kill her
husband.  He added that if she called the police she too would die.
(T2. 3115-25.)

Subsequent crime-scene investigation failed to locate

---

[1] Hereinafter T2 denotes the second trial's transcript; T1, the
first trial's. "V" stands for volume.

satisfactory fingerprints for comparison.  But in spite of the
assailant's pillowcase mask and the blindfold used during the rape,
Sherin was able to describe him as a young (T2. 3129) Caucasian
male (T2. 3193) who was approximately 5'9" inches tall (T2. 3106)
with an aquiline nose, high cheekbones, brown hair and bushy
eyebrows (T2. 3117).  More uniquely, she noted that amid the
violence of the rape her assailant dwelt on her husband whom he
knew by name and who "stole his house." (T2. 3117.)  A rape kit
was also performed.  (T2. 3126.)

Two years later, on November 19, 1990 at approximately 8:20
a.m.--virtually the same time at which the Sherin crimes commenced-
-Deborah Cabo came home after dropping her daughter off at school
to find Dolan, whom she had never seen, standing inside her home.
He refused to identify himself, claiming to be there for a
landscaping job.  Increasing the palpable oddness of the situation,
Dolan then began to question Mrs. Cabo about her neighbors.  At
length Dolan apologized for the apparent misunderstanding and
proceeded to back out of Mrs. Cabo's driveway in a Nissan truck
whose appearance and license plate number she duly recorded.  She
thereupon reported the episode and information to the police. (T2.
1321-27.)

A month passed.  On December 12, 1990 at, again,
approximately 8:20 a.m., Mrs. Cabo returned to her home after
dropping off her son at school.  There in the hallway, completely

clad in black, gloved and masked, stood Dolan clutching a shotgun. He pumped it. Accosting her, he first shoved her to the floor and then handcuffed her arms behind her back. Dolan carried her into a bedroom, and, after threatening to shoot her in the groin with the shotgun, raped her. Similar to the Sherin rape, Dolan demanded Mrs. Cabo's checking card and PIN number. When this proved unsuccessful, he screwed the rings off her fingers and departed the house with them. (T2. 1331-49.)

During the follow-up police investigation Mrs. Cabo described the rape, the Nissan truck which made an appearance on both November 19 and December 12, the assailant's appearance (his clothing was reminiscent of a ninja's)and had a rape kit performed. (T2. 31; 1392-94.) On December 12, 1990 Mrs. Cabo picked Dolan out of a photospread lineup; presented with another lineup identification on July 14, 1991, she singled him out once more. Separately, Nancy Modica, a neighbor of Cabo's, identified Dolan in a photo array as the Nissan truck's driver who was seen near the Cabo house on the morning of the rape. (T2. 1416-21; 1427; 1446-47; 1509-13; 1536; 1682-84; 1716; 1753; 1962-64; 2037; 2040; 2505-23.)

The first step in the Cabo rape investigation was to deduce from the Nissan truck's license plate number the identity of the rapist. Registered to Marianne Carroll, the truck was nevertheless being used by one Paul Czumack. (T2. 80-83; 150-51.)

4

Czumack's name was not unknown to the detectives on the case. Eight days prior to the December 12, 1990 Cabo rape, Dolan filed an incident report with the Suffolk County Police Department complaining that some of his landscaping equipment had been stolen together with his puppy. In explaining the nature of his business to a detective, Dolan represented that he repaired, purchased and sold homes and that his business partner was Paul Czumack. Now alert to a potential lead in the Cabo rape, police discovered that Dolan had made a copy of the keys to Czumack's Nissan truck two days before the November 19 break-in at the Cabo residence. (T2. 1746; 2344-48; 2350-55; 2370-77).

At about the same time, investigators increasingly drew factual comparisons between the Sherin and Cabo rapes and burglaries. Thus it was then that the Sherin investigation, long dormant for lack of leads, became active again. (T2. 6571.)

Further investigation into Dolan revealed that he drove a singular Trans Am at the time of the 1988 Sherin crimes. This unique vehicle, according to four eyewitnesses, was seen on six occasions in the immediate vicinity of Sherin's home. (T2. 5241-42; 5274; 5314-26; 5354; 5361; 5375; 5382.) Dolan's stepfather and sometime girlfriend corroborated his ownership of the car. (T2. 5239-44.) Police tailed a vehicle matching the description of these witnesses as it sped away from the crime scene on the day of the Sherin rape. (T2. 5471; 5473.)

As for the Cabo rape and burglary, a clutch of witnesses spotted both the Nissan truck and Dolan near the scene of the crime both in time and space. (T2. 1416-21; 1427; 1446-47; 1509-13; 1536; 1682-84; 1716; 1753; 1962-64; 2037; 2040; 1355-68.) Subsequent investigation revealed that at the time of the rapes Dolan owned a shotgun and two pairs of handcuffs – both items central to the Cabo and Sherin rapes. (T2. 118-20; 2116-23; 2187-88.)

Ultimately, on August 14, 1991 Dolan provided a compelled DNA exemplar. It proved pivotal. RLFP DNA testing demonstrated that Dolan's DNA profile matched evidence gathered from the locations of the Sherin and Cabo crimes. (T2. 6105; 6112; 6184-90; 6191-97; 6148-68; 6221; 6288.) Moreover, an in-depth PCR DNA test concluded that Dolan's genetic signature alone matched the Sherin/Cabo forensic evidence. (T2. 2614-15; 4157-64; 4192-93; 4210-14; 4617-19; 4240-48; 4267; 4239; 4588-94; 4596-604; 4620.)

II.  <u>Procedural History</u>

In March 1992 Petitioner was arrested for the 1988 and 1990 crimes against Mrs. Sherin and Mrs. Cabo. (T2. 1720-21.) On April 14, 1992 Suffolk County indicted him, charging two counts of Burglary in the First Degree, two counts of Rape in the First Degree, two counts of Robbery in the First Degree, two counts of Sexual Abuse in the First Degree, one count of Unauthorized Use of a Motor Vehicle in the First Degree, one count of Unauthorized Use

of a Motor Vehicle in the Third Degree, and one count of Criminal Trespass in the Third Degree.

Pre-trial motions ensued and were consolidated. On April 22, 1993 the County Court, Suffolk County denied Dolan's motions to suppress statements and physical evidence. The court likewise denied Dolan's attack on the police's identification procedures which argued that they were unduly suggestive. It also held that the government's DNA evidence would not be suppressed.

Dolan's first trial was conducted from October through December 1993. Unanimous though the jury was on the Criminal Trespass count, it deadlocked on all of the remaining counts, prompting the County Court to declare a mistrial. (T1V.2 222.) For the Trespass conviction Dolan received a one year definite sentence on January 5, 1994.

In December 1994 Dolan was retried on the counts that the jury was unable to reach a verdict on. This time, in March 1995, a jury unanimously convicted Dolan of all the counts in the original indictment.

Numerous and varied appeals followed. Each is discussed in the context of the particular claims Petitioner has raised.

<u>DISCUSSION</u>

I.    <u>Federal Habeas Review Of State Convictions</u>

Petitioner filed this action after the April 24, 1996, effective date of the Anti-terrorism and Effective Death Penalty

Act of 1996 ("AEDPA").  The AEDPA's provisions therefore apply to his case.  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 402, 120 S. Ct. 1479, 1518, 146 L. Ed. 2d 389 (2000).

Respondent rightly concedes that Petitioner has satisfied the exhaustion requirements of 28 U.S.C. § 2254(b) by directly appealing and collaterally attacking his conviction in the highest state courts.  It also rightly concedes that Petitioner's writ is timely, for it was filed within one year of the expiration of the time in which to file a writ of certiorari in New York.

Unless a petitioner can demonstrate both cause and prejudice or a fundamental miscarriage of justice, federal courts may not review state court decisions resting on an "adequate and independent" procedural default rule.  <u>Fama v. Commissioner of Correctional Services</u>, 235 F.3d 804, 809 (2d Cir. 2000).  In the common circumstance where the state court "uses language such as 'the defendant's contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review."  <u>Id.</u> at 810.

Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This deferential review is applied so long as the "federal claim has been 'adjudicated on the merits' by the state court." Cotto v. Herbert, 331 F.3d 217, 231 (2d Cir. 2003). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks omitted).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (internal quotation marks and alterations omitted)). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." Penry v. Johnson, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case[.]"

<u>Williams v. Taylor</u>, 529 U.S. 362, 407-08, 120 S. Ct. 1495, 1520, 146 L. Ed. 2d 389 (2000). Accordingly "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

II. <u>Petitioner's Right To Testify Was Not Violated</u>

Petitioner attributes the first trial's jury deadlock to his decision to testify in his own behalf. By the same token, he reasons that the jury's decision in the second trial to find him guilty on all counts was a direct consequence of his failure to personally testify. On direct appeal, therefore, Petitioner offered three arguments that spring from this failure. He argued that his constitutional right to testify in his on behalf was violated through (1) the trial court's failure to protect the right; (2) the denial of his right to counsel free of conflict; and (3) his attorney's interference which rose to the level of ineffective assistance of counsel. The arguments, and their reception on appeal, are treated <u>seriatim</u>.

A. <u>The Trial Court Did Not Fail To Protect The Right Petition's Point Number 2)</u>

Petitioner contended on direct appeal that his constitutional right to testify in his own behalf was violated when the trial court neglected to ensure that defendant's failure to testify represented a voluntary, intelligent and personal waiver of

the right.  See People v. Dolan, 2 A.D.3d 745, 746 (2d Dept 2003).

By way of background, on November 28, 1994, Petitioner filed a pro se motion to relieve assigned counsel, Mr. Giannini, on the ground that counsel, among other things, disagreed with Petitioner's belief that he should testify in his own behalf.  The trial court denied that motion without further inquiry into Petitioner's alleged quarrel with counsel on this point.

In rejecting the merits of this argument, the Second Department cited the rule that "a trial court does not have a general obligation to sua sponte ascertain if the defendant's failure to testify was a voluntary and intelligent waiver of his right." Dolan 2 A.D. 3d at 746 (citing Brown v. Artuz 124 F.3d 73, 79 (2d Cir. 1997)).  Although the Brown court's suggestion that "exceptional circumstances" might require a trial court to inquire into the voluntariness of a defendant's failure to testify is dicta, the Second Department charitably construed the suggestion as a rule of law and found that such circumstances were not manifest in Petitioner's trial.  Thus to the extent the Second Department applied incorrect governing law (which, in any case, was not governing law as determined by the Supreme Court of the United States), it was to the benefit of the Petitioner.

In support of these holdings, the Second Department made the following factual finding, which the Court accords a deferential "presumption of correctness".  18 U.S.C. § 2254(e)(1):

The defendant never expressly stated that he wanted to testify during the trial. Therefore, it was not irrational that the defendant did not testify. Further, although the defendant indicated in a pretrial pro se motion for the appointment of new counsel that one of the problems with his then-attorney was that he would not allow him to testify, the defendant merely indicated that he wished to testify "if necessary." Accordingly, it was reasonable for the court to believe that any dispute about whether the defendant should testify was resolved. <u>Dolan</u>, 2 A.D. 3d at 746.

Petitioner fails to rebut this finding with "clear and convincing evidence." 18 U.S.C. § 2254(e)(1).

In any event, the standard found in § 2254 is whether the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, <u>as determined by the Supreme Court of the United States</u>." 18 U.S.C. § 2254(d). (Emphasis added.) At the time of the relevant decision, it was not clearly established law whether the recognized right to testify in one's own behalf rested within the category of rights that may be waived by defense counsel on behalf of the defendant or was a so-called "personal" right waivable by the defendant alone. <u>See</u> <u>Brown</u> 124 F.3d at 79. This matters because Petitioner's argument on appeal that the trial court constitutionally erred by failing to protect his right to testify was predicated on the assumption that the right was "personal". For purposes of § 2254, the assumption is fatal, for the "personal" nature of the right had not been established by the Supreme Court at the time of the decision of

which he seeks habeas review. <u>See</u> <u>id.</u>

B.    <u>Trial Counsel Did Not Violate The Right (Points 1 and 4)</u>

Petitioner argued on direct appeal that his trial counsel's refusal to let him testify in his own behalf amounted to ineffective assistance of counsel. The Second Department did not explicitly rule on this claim. Rather, the court denied it with the explanation that it was "either not preserved for appellate review, without merit, or constituted harmless error in view of the overwhelming evidence of guilt." <u>Dolan</u>, 2 A.D.3d at 745. Where the state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." <u>Fama</u>, 235 F.3d at 810. Federal habeas courts review outcomes, not reasoning, when applying § 2254(d)'s "unreasonable application" clause to silent state-court opinions. <u>Jimenez v. Walker</u>, 458 F.3d 130, 147 (2d Cir. 2006).

Thus the question becomes whether the Second Department's rejection of this particular ineffective assistance claim involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. To establish an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's performance fell outside the range of professionally competent assistance and (2) but for counsel's deficient performance, there is a reasonable probability that the

result of the proceeding would have been favorably different.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); <u>see</u> <u>also</u> <u>Brown</u> 124 F.3d at 79.

With the exception of Petitioner's pro se motion in which he alludes to his desire to testify in his own behalf "if necessary", the record is bereft of compelling evidence that trial counsel foiled the exercise of Petitioner's right.  This is why Petitioner resorts to the argument that defense counsel's comment to the jury that Petitioner would not testify stifled Petitioner's exercise of the right.  That position fails because nothing about that comment necessarily or practically prevented Petitioner from testifying.  If testifying in his own behalf were as pivotal in his case as Petitioner asserts, he surely would not let a foolish consistency prevent it.  If he did, the fault is his own, for he does not claim that the importance of such consistency was stressed to, or imposed upon, him by counsel.  His assertion, then, that counsel's performance fell outside the range of professionally competent assistance comes up short.

In any case, Petitioner has not made a convincing showing that but for trial counsel's "error" there is a reasonable probability that the result of the proceeding would have been favorably different.  There are at least two flaws of logic in his contention that, had he testified, the second jury would have reached the same result as the first jury who did hear him testify.

First, it assumes without supporting evidence that the first jury deadlocked as a result of his testimony rather than of any number of other factors: correlation does not necessarily imply causation. Second, even if the previous assumption were well founded, it assumes further that a second jury would similarly overlook overwhelming evidence of guilt merely because the first one did so. One jury deadlock is too small of a sample on which to base a finding that there is a reasonable probability that the same result would be obtained in the future had he testified again.

III. <u>Disagreement Between Petitioner And Counsel Did Not Constitute An Actual Conflict Of Interest (Point 5)</u>

In his collateral CPL § 440.10 motion, filed ten years after the alleged error, Petitioner asserted a violation of his right to representation free from conflicts of interest that was rooted in his off-the-record disagreement with trial counsel over whether Petitioner should testify.

Of this argument the § 440.10 trial court wrote that:

> The alleged disagreement between defendant and trial counsel as to whether defendant should testify at trial amounts to a disagreement over trial strategy, not a conflict of interest. Further, defendant's application to vacate judgment on this ground must be denied for defendant's unjustifiable failure to raise this issue on appeal pursuant to CPL § 440.10(2)(c).

The second part of that holding--that Petitioner's application to vacate judgment on the ground of an actual conflict of interest must be denied for failure to raise the issue on appeal

- cannot serve as a procedural bar to habeas review.  That is because New York courts do not regularly apply CPL § 440.10(2)(c) to such ineffective assistance claims, dependant as such claims are on extrinsic evidence of the type ordinarily offered in a collateral attack rather than on direct appeal.  See <u>Bell v. Miller</u>, No. 05-CV-0663, 2005 WL 1962413, at *5 (E.D.N.Y. Aug. 12, 2005).  The Court therefore declines the Government's invitation to eschew merits-based analysis.

As the above-quoted holding clearly passes judgment on the merits of Petitioner's claim, the Court views it through the lens of AEDPA deference.  The claim was that Petitioner and his assigned counsel, Mr. Giannini, were in such acute disagreement over the issue of Petitioner testifying in his own behalf that an irreconcilable conflict of interest existed.  Petitioner's claim therefore posits an actual conflict of interest.

Under <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), reversible error is found when a defendant establishes that his attorney had an actual, as opposed to potential, conflict of interest that adversely affected the lawyer's performance; prejudice is presumed.  Quarrels among counsel and the represented over trial strategy do not amount to actual conflicts of interest.  <u>See</u> <u>United States v. Rahman</u>, 189 F.3d 88, 144 (2d Cir. 1999).  An adverse impact on the lawyer's performance may be shown by a "plausible alternative defense

strategy or tactic [that] might have been pursued [which was] inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." <u>United States v. Levy</u>, 25 F.3d 146, 157 (2d Cir. 1994). Petitioner offers a plausible alternative defense strategy or tactic that might have been pursued--namely, testifying in his own behalf--but he neglects to allege that his failure to testify should be chalked up to Mr. Giannini's "other loyalties or interests." Nor is it readily apparent what manner of conflicted loyalty would prompt Mr. Giannini to counsel Petitioner against testifying. Therefore it cannot be said that the denial of Petitioner's CPL § 440.10 motion was an unreasonable application of Federal law as defined by the Supreme Court of the United States.

IV. <u>Petitioner Was Not Denied His Counsel Of Choice (Point 6)</u>

On direct appeal Petitioner claimed that by not appointing the lawyer who represented him during the first trial, Mr. Wilutis, as his 18-b attorney for the second trial, the trial court violated his constitutional right to counsel of choice.

The Second Department held that this claim was either without merit, unpreserved, or based on harmless error in view of the overwhelming evidence of Petitioner's guilt. <u>Dolan</u>, 2 A.D.3d at 747. As above, the question thus becomes whether the Second Department's rejection of this claim represented a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States.

An element of the Sixth Amendment right to assistance of counsel is "the right of a defendant <u>who does not require appointed counsel</u> to choose who will represent him." <u>Caplin & Drysdale, Chartered v. U.S.</u>, 491 U.S. 617, 624-625, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989) (Emphasis added.) A defendant who desires substitution of <u>assigned</u> counsel, on the other hand, must provide the court with legitimate reasons for calling into question current counsel's ability. <u>See</u> <u>McKee v. Harris</u>, 649 F.2d 927, 932 (2d Cir. 1981). The decision whether to grant a substitution rests within the trial court's sound discretion. <u>Id.</u> at 931.

Because Petitioner had counsel assigned to him and above all because he fails to show how the trial court abused its discretion in its decision not to dismiss assigned counsel whose representation the court deemed adequate, the Court cannot conclude that the Second Department's denial of Petitioner's claim on appeal was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

V.  <u>Petitioner's Right To Proceed Pro Se Was Not Violated (Point 3)</u>

The Sixth Amendment's right to counsel implies a corollary right to eschew a lawyer's assistance and proceed <u>pro se</u>. <u>See</u> <u>Adams v. United States</u>, 317 U.S. 269, 279 (1942). Since the decision to dispense with a lawyer carries a serious risk of peril,

18

the accused must be forthright and unequivocal in his declaration to go it alone.  See Faretta v. California, 422 U.S. 806, 835, 95 S. Ct. 2525 (1975).  Unless and until such an unequivocal request is made, the trial court comports with the Constitution without making an inquiry into whether the waiver was knowing and voluntary.  Id.  The right of self-representation is a so-called "structural" right, the violation of which is not subject to harmless error analysis.  See McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984).

As with Petitioner's choice-of-counsel claim, the Second Department held that this claim was either without merit, unpreserved, or based on harmless error in view of the overwhelming evidence of Petitioner's guilt.  Dolan, 2 A.D.3d 745 at 747.

The question for this Court, then, is whether it was a reasonable application of the Faretta equivocation test to conclude that Petitioner did not unequivocally declare his desire to proceed pro se.  Between August and November 1994, Petitioner filed three pro se motions to reassign counsel, none of which included a request to proceed pro se.  On December 7, 1994 in a brief colloquy with the trial judge on the topic of Petitioner's motion to reassign counsel, Petitioner stated "if the court rules against reassignment of counsel, I have no other choice [than to proceed pro se]."  (T2. 5.)  As the statement is susceptible of multiple interpretations, a reasonable application of Faretta might well

19

lead to the conclusion that the request to proceed pro se was equivocal. (For example, with that remark Petitioner may not have signaled his intent to represent himself so much as he meant to impart the acuteness of his qualms about counsel or to warn the judge about the burdensome consequences for the court that would follow a decision not to reassign counsel.)

Accordingly Petitioner is not entitled to habeas corpus relief on this score.

VI. Petitioner's Right To Counsel Was Not Violated Due To Inadequate Access (Point 16)

Petitioner claimed on direct appeal that the Suffolk County Sheriff's Department unconstitutionally interfered with his right to counsel at critical stages of the prosecution. The Second Department denied the claim, holding it was either without merit, unpreserved, or based on harmless error in view of the overwhelming evidence of Petitioner's guilt. Dolan, 2 A.D.3d at 747. Once again, the claim's merits are therefore subject to review and AEDPA deference applies.

A defendant's Sixth Amendment right to counsel is violated where counsel is "prevented from assisting the accused during a critical stage of the proceeding." U.S. v. Cronic, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

On December 13, 1994 Petitioner's assigned counsel, Mr. Giannini apprised the trial court that on three separate occasions he had encountered difficulty meeting the Petitioner at the jail

due to staffing issues. (T2. 775/1; 775/47-49.) The court recommended seeking help from the Suffolk County Bar Association. On February 27, 1994 Mr. Giannini once more informed the court that he had been unable to gain access to Petitioner on several further occasions. To that he added that Petitioner's ability to call counsel had been curtailed. In response the court arranged for Petitioner and counsel to meet the following afternoon. The prosecutor, for her part, intimated that Petitioner was subject to special incarceration conditions in view of a prior escape attempt. (T2. 6302-08.)

Crucially, Petitioner never was prevented from conferring with his counsel during trial, on court dates, and on all those days when the Sheriff's Department decided that receiving visitors presented no undue hazards. As well, it is axiomatic that the Sheriff's Department may ensure safe conditions at the jail by establishing guidelines and rules for visits. Petitioner does not allege that he was subject to anything but the conventional rules applied equally to all of the incarcerated.

More to the point, Petitioner furnishes the Court with no clearly established Federal law, as determined by the Supreme Court of the United States, holding that intermittent inconvenience in communications between counsel and a defendant which is later resolved by the trial court amounts to a deprivation of counsel during a critical stage of the proceeding. Moreover, the Court

21

finds none.  It therefore concludes that the denial of this claim in the circumstances presented does not constitute an unreasonable application of Supreme Court precedent.

VII.    <u>Petitioner's Double Jeopardy Right Was Not Violated</u>

Petitioner's first trial, which began on October 12, 1993 and lasted for eleven weeks, culminated in a deadlocked jury.  (T1. 222.)  The foreperson reported that a single juror was unwilling to be open-minded or to discuss the case in a reasonable manner.  (T1 V.2 89; 92.)  The court reacted by reading an <u>Allen</u> charge to the jury, but to no avail – the foreperson delivered a note to the judge declaring that a unanimous verdict would never be reached. (T1V.2 107-15.)  Thus it was that Petitioner's counsel moved for a mistrial with the argument that the jury was "hopelessly deadlocked."  (T1V.2. 192.)  Denying that motion, the court read the <u>Allen</u> charge a second time.  (T1V.2. 193.)  When further deliberation failed to produce unanimity, the judge directed the jury to render a partial verdict (on the Criminal Trespass count) and declared a mistrial as to the remaining counts.  (T1V.2 222.) Petitioner's second trial followed.

On direct appeal Petitioner argued that his second trial subjected him to double jeopardy as he was retried after a trial "at which the People had failed to produce legally sufficient evidence."  The Second Department held that the claim had no merit inasmuch as the second trial was conducted after a proper mistrial,

22

born of jury deadlock, had been declared with the defense's consent. Dolan, 2 A.D.3d 745 at 747.

When a state retries a defendant following a mistrial that is declared out of "manifest necessity", the constitutional protection against double jeopardy is not infringed. See Richardson v. United States, 468 U.S. 317, 324, 104 S. Ct. 3081, 3085 (1984). Refractory jury deadlock is a paradigmatic example of what constitutes manifest necessity. See United States v. Chestaro, 197 F.3d 600, 610 (2d Cir. 1990). Where, as here, the defendant consents to, or indeed moves for, a mistrial, inquiry into manifest necessity is virtually always obviated, save in the exceptional case where a defendant is strategically provoked into moving for a mistrial. See Oregon v. Kennedy, 456 U.S. 667, 679, 102 S. Ct. 2083, 2091 (1982).

Here, the trial court declared a mistrial, pursuant to Petitioner's repeated requests, out of the manifest necessity that the jury was stubbornly deadlocked. For five days the jury failed to achieve unanimity notwithstanding two Allen charges provided by the judge; it ultimately agreed that the lone dissenting juror would not be prevailed upon. In view of such circumstances, even were the AEDPA standard de novo, it could not be said that Petitioner's Double Jeopardy protection was violated.

VIII.  Petitioner's Constitutional Right To A Speedy Trial Was Not Infringed

On April 14, 1992 Petitioner was indicted and arraigned

23

nine days later. On October 12, 1993, ten months later, his first trial commenced. Except for the period from June 21, 1993 to July 14, 1993, most of the delay in the interim was either caused or contributed to by the Petitioner. (Speedy Trial Motion, p. 2-3.)[2]

On January 1, 1994, following the above-mentioned jury deadlock, the jury returned a partial verdict convicting Petitioner of Criminal Trespass. Later that year, in December 1994, Petitioner's second trial began. Again, Petitioner either consented to or requested the adjournments that punctuated the period before re-trial. Petitioner's motions to relieve or reassign counsel (filed on August 11, 1994, October 11, 1994, and November 28, 1998), coupled with his motion to sever the two rape counts, were responsible for much of that delay.

In July 1993, Petitioner made two pre-trial motions to dismiss the indictment on speedy-trial grounds, both constitutional and statutory. (Speedy Trial Motion, p. 1.) The statutory argument, based on CPL § 30.30, was that the prosecution's May 1991 motion for a DNA exemplar and to require Petitioner to participate in a lineup should have been treated as an accusatory instrument which would trigger the six-month speedy trial clock. This the County Court, Suffolk County (Jones, J.) denied, holding that the motion did not constitute an accusatory instrument as defined by

---

[2] "Speedy Trial Motion" stands for the decision rendered by the County Court, Suffolk County (Jones, J.) on August 9, 1993.

CPL § 1.20(1).  (Speedy Trial Motion, p. 2-3.)

    The constitutional aspect of Petitioner's argument claimed inordinate pre-indictment delay resulting from the prosecution's impermissible use of the pending rape charges to maintain prohibitive bail on unrelated criminal charges.  This delay, Petitioner asserted, enabled the prosecution leisurely to prepare the case against him even as it denied him the rights triggered by a formal accusatory instrument.  The County Court ruled that, on the contrary, the prosecution acted in good faith and with adequate diligence.  (Speedy Trial Motion, p. 2-3.)

    In direct appeals subsequent to Petitioner's first and second trials, he raised both the statutory and constitutional speedy trial arguments, this time adding the contention that, owing to the violations, he was prevented from acquiring alibi witnesses for the Sherin crimes.  As viewed by the Second Department in an appeal from the first trial, the constitutional claim lacked merit--the delay between indictment and trial was "only" ten months for which the government showed good cause and, in any event, Petitioner was already in prison for unrelated charges.  In its review of the same arguments after the second trial, the Second Department summarily denied the claims as being unpreserved, without merit or of harmless error.  Dolan, 2 A.D.3d at 747.  Thus because Petitioner's constitutional speedy-trial claims were disposed of on the merits, they are subject to habeas review here

and analyzed through the prism of AEDPA deference.

It should be noted that Petitioner's statutory speedy trial claim under CPL § 30.30 is exclusively based on an error of state law; it is therefore not amenable to habeas corpus relief. See Estelle v. McGuire, 502 U.S. 62, 67 112 S. Ct. 476, 116 L. Ed. 2d 385 (1991).

In Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182 (1972), the Supreme Court established a set of factors to assess a constitutional speedy trial claim. They are: (1) the length of the delay between the criminal prosecution's commencement and the start of the trial; (2) the reason for the delay and whether the government or defense is primarily responsible; (3) whether the defendant made a reasonable assertion of the right; and (4) the nature of the prejudice incurred from the delay. Id. at 530.

Here ten months passed between Petitioner's arraignment and his first trial. In this period several motions, some of them Petitioner's, were filed, which in turn occasioned hearings; many adjournments were either consented to or prompted by Petitioner. These facts must be viewed in contrast with considerably longer delays that nevertheless have not induced courts to find speedy-trial right violations. See, e.g., Barker, 407 U.S. at 534 (involving an interlude of over five years); Flowers v. Warden, 853 F.2d 131, 133 (2d Cir. 1988) (seventeen months); Rayborn v. Scully, 858 F.2d 84, 89 (2d Cir. 1988) (seven years).

26

As well, the government's case carried grave criminal charges. As a general rule, more time will be allotted to the government within the speedy-trial framework as the charges alleged become increasingly serious.  See <u>Barker</u>, 407 U.S. at 531.

Petitioner would have the Court find prejudice in his inability to call an alibi witness.  But without an explanation as to how the ten-month window between arraignment and trial hampered his search for such a witness, the argument lacks merit.  Indeed, so far from being thwarted by the government's temporizing, Petitioner was notified of the Cabo and Sherin investigations almost one year before his arrest through the Order to Show Cause. He cannot argue away or adequately account for his failure to summon an alibi witness during this ample window of time.

Therefore this Court cannot conclude that the denial of his constitutional speedy-trial claim constituted an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

IX.  <u>Petitioner's Claims Regarding Identification Evidence Are Not Subject to Federal Habeas Review (Point 10)</u>

On direct appeal after his second trial, Petitioner challenged the identification testimony of Deborah Cabo and Nancy Modica in two ways.  First, he argued that Judge Hurley infringed his Fourth Amendment rights by ordering him without probable cause to participate in identification lineups.  Second, he contended that his due process rights were violated through an unduly

suggestive identification procedure in which his physical appearance uniquely stood out among the fillers.

Presented with these claims the Appellate Division held:

> [t]he defendant's contentions that the hearing court improperly denied that branch of his motion which was to suppress identification testimony and his motion to dismiss the indictment are partially unpreserved for review (citing CPL § 470.05[2]). In any event, those motions were properly denied (citing <u>Dolan</u>, 2 A.D.3d 744). <u>Dolan</u>, 2 A.D.3d at 745-46.

When a state court decision holds, as here, that a claim is procedurally barred but lacks merit "in any event", the federal habeas court may not review it. <u>See</u>, <u>e.g.</u>, <u>Glenn v. Bartlett</u>, 98 F.3d 721, 724-25 (2d. Cir. 1996).

Although the Appellate Division somewhat equivocally held that Petitioner's identification testimony claims were "partially" unpreserved, the government raised the preservation doctrine only in regard to Petitioner's argument that his Fourth Amendment rights had been violated when Judge Hurley ordered his participation in lineups without probable cause. This particular claim was therefore disposed of under an independent and adequate state ground; namely, to preserve the probable cause claim, Petitioner was required either to seek Article 78 review of Judge Hurley's order or else to move for suppression. He did neither. Accordingly the claim is not subject to AEDPA review.

At all events, were the claim subject to Habeas review

the Court would find no merit in it because Judge Hurley relied on sufficient probable cause in ordering Petitioner to participate in the lineups. Probable cause in this case consisted of (i) Deborah Cabo's description of the man who unlawfully entered her home a month before the rape; (ii) Cabo recorded the license plate number of the truck Petitioner drove, which belonged to his friend and which, according to Petitioner's quondam girlfriend, Petitioner had been driving at the time of the rape; (iii) the testimony of Martin Santos and Nancy Modica who observed the same truck in the vicinity of Cabo's home at the time of the rape; (iv) the testimony of Petitioner's ex-girlfriend who verified that Petitioner owned a shotgun at the time of the Cabo rape during which a shotgun was brandished.

Petitioner also argued on direct appeal that the trial court erred by refusing to suppress Deborah Cabo's identification testimony. More specifically, he claimed that the identification procedure undertaken was unduly suggestive in the way his physical appearance stood out in the lineups (he was taller than the others). The Appellate Division held that the motion was correctly denied on the merits. Dolan, 2 A.D.3d at 745-46. The question for the present purpose, then, is whether this result constitutes an unreasonable application of Federal law as defined by the Supreme Court of the United States.

A flawed identification procedure may be "'so

unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." <u>Foster v. California</u>, 394 U.S. 440, 442, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969) (<u>quoting</u> <u>Stovall v. Denno</u>, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)). Yet even if an identification method is suggestive, the "central question" is whether "under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." <u>Neil v. Biggers</u>, 409 U.S. 188, 199 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972). Courts consider the following factors in deciding whether an identification is reliable independent of the suggestive procedure:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. <u>Id.</u> at 199-200.

Because this standard is permissive, courts engaged in its execution are afforded considerable latitude. <u>See</u> <u>Brisco v. Ercole</u>, 565 F.3d 80, 90 (2d Cir. 2009).

Here the trial court decided that both Deborah Cabo and Nancy Modica had an independent basis for their identifications:

> Mrs. Cabo had the opportunity to view the intruder in her home on November 19, 1990 at short range in daylight and over a period of time during which a short conversation took

30

place. Based on all the circumstances, including her testimony, which the court finds credible, Mrs. Cabo has an independent basis for identification of the defendant which would enable her to give identification testimony at trial. Ms. Modica testified that she first observed the defendant in the driver's seat of a truck at or near the intersection of Frances and Clay Pitts Road at approximately 8:10 a.m. on December 12, 1990. The driver was staring at her. She was driving toward the truck, eventually passing it; his staring upset her and she made a special note of him and the truck. She testified that her recollection of the defendant came from that encounter . . . The court finds [that testimony] credible and concludes she had an independent basis. (Pre-Trial Hearing Order, p. 5).

Under the AEDPA framework, a state court's decision of a factual issue, which is presumed correct, is irrebuttable except through a showing of clear and convincing evidence. 28 U.S.C. § 2254 (e)(1).

In his Memorandum of Law in support of the Petition, Petitioner offers on this point no evidence, much less clear and convincing evidence. Accordingly, the Court cannot conclude that the trial court's considered analysis of the identification issues reflected an unreasonable application of Federal law as defined by the Supreme Court.

X.  The Denial Of Petitioner's Motion To Sever Did Not Violate His Due Process Rights to A Fair Trial

Prior to his second trial Petitioner filed a motion to sever the Sherin and Cabo counts pursuant to CPL § 200.20(3), which enables a court to sever "for good cause shown" any case in which

31

"two or more offenses or groups of offenses charged in an indictment are based upon different criminal transactions, and where their [combination] rests solely upon the fact that such offenses . . . are the same or similar in law."

Petitioner's motion was a reaction to Mary Jean Sherin's testimony in the first trial. (T2-775. 14.)[3] Although Sherin never took part in a lineup identification, she declared on the stand that Petitioner's facial characteristics appeared akin to those of her assailant. At first this identification was tentative. As the trial progressed, however, Sherin grew increasingly convinced that she could identify Petitioner as the rapist. (T1. 1565-1627.)

In his motion to sever in the second trial Petitioner argued that one of the victims (Cabo) would identify Petitioner and the other one (Sherin) would not, resulting in the prejudice that the jury would apply Cabo's identification for both sets of crimes. (T2. 26-27.) In denying the motion, the court noted that since it had the "luxury of having presided over the first trial" it was well acquainted with the prosecution's evidence. (T2. 27.) Based on this insight, he found "no reason to suppose that the jurors will confuse [the two sets of crimes]." On the other hand, the judge denied the prosecution's attempt to permit Sherin to testify

---

[3] T2-775 refers to the transcript from a conference that transpired on December 13, 1994 during the second trial.

about the identification she made during this first trial; so, the jury did not hear Sherin state that Petitioner's features were like those of the culprit. (T2-775. 20.)

On direct appeal Petitioner advanced the claim that the trial court's denial of his motion to sever amounted to a violation of his due process right to a fair trial. (The government urges the Court to find a failure preserve here in view of the discrepancy between Petitioner's premise at trial that it was the weightier evidence from the <u>Sherin</u> case that would prejudice the Cabo case and the exact opposite premise on appeal. The Court declines the invitation but finds the reversal telling.) The Appellate Division summarily provided that this claim was either not preserved for appellate review, without merit or constituted harmless error. <u>Dolan</u> 2 A.D.3d at 747. The question is therefore whether this outcome represents an unreasonable application of governing federal authority as defined by the Supreme Court of the United States.

Even assuming the joinder were erroneous--which the Court does not find--a violation of the Constitution by misjoinder occurs only where "it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." <u>United States v. Lane</u>, 474 U.S. 438, 446 n.8, 106 S. Ct. 725 (1986).

There is simply no indication that the Appellate Division's decision represents an unreasonable application of this

principle. In any case, Petitioner fails to show why it was unreasonable to find no prejudice in the circumstances. On the contrary, his reversal on the question of which case carried more probative evidence of guilt argues for the reasonableness of the Appellate Division's application of Federal authority. Apart from Petitioner's vacillating position, for each of the two sets of crimes the government offered separate witnesses and distinct pieces of evidence of substantially equal weight.

Accordingly Petitioner's misjoinder claim must be, and is, denied.

## XI. Sufficiency Of Evidence (Point 18)

When the prosecution's case in the second trial concluded, Petitioner's counsel moved for a dismissal, contending that the government failed to establish a prima facie case. (T2. 6349.) In this regard he pointed out that the prosecution's case was built entirely on circumstantial evidence; that he never confessed or made admissions; that law enforcement seized no evidence of Petitioner's guilt at the scenes of the crimes; and that the DNA evidence was unreliable for lack of a proper foundation. (T2. 6349-50.) Following the jury verdict of guilty on all counts the trial court denied the motion. (T2. 7807.)

On direct appeal Petitioner rehearsed the arguments found in his motion and added claims concerning the credibility of the witnesses and the alleged inconsistencies of their testimony. He

argued too that reasonable doubt should have been found in the evidence that a third party was present during the Sherin rape and that his physical condition at the time of the crime precluded his perpetration of it. The Appellate Division held that the insufficiency of evidence claim was "partially unpreserved" and that "in any event" the evidence was sufficient to establish guilt beyond a reasonable doubt. The court specifically cited in this regard the DNA evidence and the testimony that placed him near the scenes of the crimes. See Dolan 2 A.D.3d at 746.

As to all of the claims that Petitioner presented to the Appellate Division in the first instance, an independent and adequate state ground bars federal habeas review. See Fama 235 F.3d at 809.

For the rest of the properly preserved sufficiency-of-the-evidence claims, AEDPA instructs the court to consider whether the Appellate Division's decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. To challenge the sufficiency of evidence in the habeas posture a petitioner must persuade the court that no rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct. 2781 (1979).

Here the Appellate Division characterized the evidence as "overwhelming." Dolan, 2 A.D.3d at 747. The Court need not

endorse that assessment in order to conclude that the Appellate Division's disposition of the claim involved no unreasonable application of the <u>Jackson</u> principle. Put another way, it was not unreasonable of the court to hold that, based on detailed eyewitness testimony, DNA evidence, Petitioner's strong connections with the unique vehicles used in the crimes and his ownership of a shotgun like the one brandished during the Cabo rape, and Petitioner's personal history with the victim Mary Jean Sherin, a rational trier of fact <u>could</u> have found the essential elements of a crime beyond a reasonable doubt.

Governing Federal law was therefore not unreasonably (and was indeed correctly) applied; the claim is denied.

XII.  <u>The Trial Court's Evidentiary Rulings Did Not Deprive Petitioner Of His Right To A Fair Trial (Numbers 9, 12, 13)</u>

On direct appeal Petitioner argued that his fundamental right to a fair trial was infringed through the following evidentiary miscues made by the trial court: (1) admitting the DNA evidence; (2) allowing the prosecution's use of a shotgun as demonstrative evidence; (3) granting the government's motion to quash a subpoena to compel testimony from the first trial's prosecutor; (4) excluding Petitioner's alibi testimony; (5) permitting the "commingling" of evidence. The Second Department summarily rejected this set of claims as being either without merit, unpreserved or harmless error. <u>Dolan</u>, 2 A.D.3d at 747. Thus the question becomes whether the Second Department's decision

36

reflects an unreasonable application of Federal law as defined by the Supreme Court of the United States.

To reach a constitutional plane, an evidentiary error must have been "crucial, critical and highly significant." <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir. 1985). A merely incorrect state ruling rises not to the level of constitutional error, and even where an error of such magnitude is found, the petition should not be granted unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38, 113 S. Ct. 1710 (1993).

A. <u>DNA Evidence</u>

On direct appeal Petitioner argued that, even though it conducted a pre-trial <u>Frye</u> hearing, the trial court erred in its decision to admit DNA evidence without first conducting a preliminary examination of the protocol and methods of the DNA analysis. He argued that such a failure would run afoul of the New York State Court of Appeals' holding in <u>People v Wesley</u>, 83 N.Y.2d 417 (1994).

First, the test in which the trial court declined to engage is not required by the <u>Welsey</u> holding inasmuch as it is merely proposed by a concurring opinion in that case. <u>See</u> <u>Welsey</u>, 843 N.Y.2d at 426. Second, the trial court held a pre-trial <u>Frye</u> hearing to which Petitioner did not object. Petitioner therefore calls the Court's attention to no Constitutional error, still less

one that had a substantial and injurious effect or influence in determining the jury's verdict.  Relatedly, Petitioner's claim on appeal that the DNA evidence for the Sherin crimes was improperly admitted due to a chain of custody error, even if true, does not reach a level of Constitutional magnitude.  See <u>Jenkins v. Bara</u>, 663 F. Supp. 891, 899 (E.D.N.Y. 1987).

     B.   <u>Shotgun As Demonstrative Evidence</u>

The trial court admitted a replica Mossberg 500 Cruiser 12 gauge shotgun to assist the jury in its appreciation of the weapon used in connection with the Cabo crimes.  (T2. 1370-89.) Petitioner argued that flourishing the weapon before the jury deprived him of a fair trial.  A correct application of a state evidentiary rule whose constitutionality is not under attack can not be deemed unconstitutional by a habeas court.  See <u>Brooks v. Artuz</u>, 97-CV-3300, 2000 WL 1532918 at *6, 9 (S.D.N.Y. Oct. 17, 2000).  Under New York law, the trial court may admit demonstrative evidence for the purpose of enabling the jury to use their visual and auditory senses in gaining "an intelligent comprehension of the case." <u>People v. DelVermo</u>, 192 N.Y. 470, 483 (1908).  Because this Court finds that the trial court's decision to admit the shotgun was correct, it does not hold that the Second Department's rejection of Petitioner's claim reflected an unreasonable application of Federal law.

     C.   <u>The Defense Subpoena Calling for the Prosecutor from the First Trial Was Properly Quashed</u>

Petitioner argued that the trial court constitutionally erred when it quashed a defense subpoena for Kerry Trainor, the prosecutor from the first trial, who Petitioner alleges orchestrated a plot to maliciously prosecute Petitioner in furtherance of his political ambitions. (At the time of the subpoena, Mr. Trainor had become a judge, though perhaps not directly in consequence of his successful prosecution of Petitioner.) (T2. 6643-44.)

Though as a general principle the defendant must be given access to material and relevant information that bears on the determination of guilt and punishment, he does not have "an unfettered right to offer testimony that is incompetent, privileged or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988).

Confronted with the theory that a prosecutor from a previous and no longer pending trial maliciously prosecuted Petitioner to enhance his career prospects, the trial court quashed the subpoena on grounds of relevance, finding the allegation not germane to the trial at hand. (T2. 6643-44.)

In his memorandum of law, Petitioner neither offers support for his theory that Judge Trainor endeavored to further his career at the expense of Petitioner's freedom nor an explanation of how this consideration would have been pertinent to the second trial. The Petitioner fails to persuade the Court that the trial

court erred under state law in this decision, still less that the holding was an error of constitutional magnitude.

      D.    <u>The Trial Court's Preclusion Of Alibi Testimony Did Not Violate Petitioner's Sixth Amendment Rights</u>

The trial court precluded Petitioner's alibi testimony for the reason that Petitioner's counsel strategically rescinded the notice of alibi and explained that Mr. and Mrs. Morafates, Petitioner's parents, would not testify. (T2.775 4-8.) Earlier, in light of the withdrawal of the alibi notice, the court allowed Mr. Morafates, Petitioner's stepfather, to observe the prosecution's case, only to have Petitioner call him as a witness eight weeks later. In spite of the court's repeated admonishments, Petitioner's counsel attempted to elicit alibi testimony from Mr. Morafates; citing the deliberate withdrawal of the alibi notice and noting that the case was eight weeks into trial, the court ultimately denied Petitioner's effort to introduce backdoor alibi testimony from the stepfather. (T2. 7223; 7229; 7230-31; 7237.) To repeat, the Appellate Division simply denied this Sixth Amendment claim with the explanation that it "lacked merit." The question here is therefore whether this decision on direct review reflected an unreasonable application of Federal law as defined by the Supreme Court of the United States.

The accused's right, located in the Compulsory Process Clause, to present witnesses in his defense is not without limit and so may be curtailed as a sanction for the violation of valid

discovery rules. See Williams v. Taylor, 529 U.S. 362, 409-10, 120 S. Ct. 1495 (2000). The Williams court highlighted in particular the risk of "something suspect" about a defense witness whom the defendant identifies "after the 11th hour has passed." Id. at 414.

Given the questionable circumstances surrounding Petitioner's submission and withdrawal of his alibi notice and the subsequent presence in court of Petitioner's proposed alibi witness during the prosecution's case, the Appellate Division could reasonably hold under Williams that the alibi notice was strategically withdrawn or that a high likelihood of fabrication existed. See Wade v. Herbert, 391 F.3d 135, 142-43 (2d Cir. 2004).

Therefore the Petition cannot be granted on this score.

XIII.   Petitioner's Ineffective Assistance Of Counsel Claim Is Without Merit

Petitioner's ineffective assistance of counsel claim on direct appeal comprised the following alleged inadequacies of his trial counsel: (1) a failure timely and adequately to consult with DNA experts; (2) improvident withdrawal of alibi notice; (3) a failure to seek suppression of DNA and identification evidence; (4) interference with petitioner's right to testify (See supra II, B); (5) a failure to investigate and consult with Petitioner satisfactorily prior to trial.

Ruling expressly on the merits of the claim, the Second Department held:

Here the record demonstrates that the defense

41

counsel effectively cross-examined the
People's witnesses, delivered a cogent opening
and closing statement, and presented a
plausible defense. Thus the defendant was
provided with meaningful representation.
Dolan, 2 A.D.3d at 746.

In a separate CPL § 410.10 motion, Petitioner claimed
that his assistance of counsel was ineffective owing to Mr.
Giannini's failure to discover before trial and use as a basis for
dismissal newly discovered evidence. Since his trial commenced in
December 1994 with sentencing transpiring on April 20, 1995 and
since the newly discovered documents were dated January and July
1996, the Suffolk County, County Court denied the CPL § 410.10
motion. The court reasoned that defense counsel could not be
faulted for failing to discover documents that did not then exist.
(Order 440.10, p.3.)

These decisions being merits-based, AEDPA deference
governs.

To establish an ineffective assistance of counsel claim,
a defendant must show that (1) his counsel's performance fell
outside the range of professionally competent assistance and (2)
but for counsel's deficient performance, there is a reasonable
probability that the result of the proceeding would have been
different. See Strickland, 466 U.S. at 687-91. In the evaluation
of trial counsel's performance, the "court must indulge a strong
presumption that counsel's conduct falls within the wide range of
reasonable professional assistance." Id. at 689. If made based on

a thorough investigation of law and facts relevant to plausible options, strategic choices are "virtually unchallengeable." Id. at 690.

Petitioner contends that his appointed counsel failed to suppress key DNA and identification evidence. This is true enough but not for lack of diligent preparation and effort, which are the pivotal criteria under the standard. Petitioner's first counsel, Mr. Wilutis, filed an exhaustive omnibus motion to attack the search warrants and to suppress physical evidence, Petitioner's statements, the DNA evidence and the identification testimony. He ably supported the motion with a memorandum of law and adequately argued the motion during a long hearing. Mr. Giannini, who replaced Mr. Wilutis as Petitioner's counsel, was saddled with the decision denying suppression of the identification and DNA evidence. Despite this, he endeavored at trial to thwart the use of the evidence through objections and a motion to sever.

In his memorandum of law, Petitioner argues that "where DNA evidence was the backbone of the prosecution, defense counsel never consulted, much less retained or called as a witness a DNA or population genetics expert." Pet'r Mem. of Law, p. 18. Yet Mr. Giannini did in fact present at trial a DNA expert, Mr. Peter D'Eustachio, who highlighted the prosecution's failure to inform the jury about the error rate involved in its DNA analysis. (T2. 6903-06.) If Mr. Giannini was indeed cautious about the subject of

the error rate, this may have been rather prudent than "haphazard ":discussion of the error rate could have opened the door to Hardy-Wienberg Rule statistical results showing a "full statistical range with regard to defendant which was 1 in 25 million." (T2. 6905.) In this way, Mr. Giannini's inaction was strategic.

This Court cannot agree with Petitioner that counsel's decision to request that the trial court break early so that he might discuss the "ceiling principle" with the DNA expert fell so far outside the wide range of reasonable professional assistance that there is a reasonable probability that the result of the proceeding would have been different had counsel done otherwise. Quite the reverse: this is a proof of Mr. Giannini's effort to elicit favorable testimony from the expert.

Likewise, the Court does not conclude that the Second Department unreasonably applied the Strickland analysis in regard to Petitioner's claim that trial counsel's withdrawal of the alibi notice for his mother and father constituted ineffective assistance. The Second Department could have reasonably found that this decision was strategic in nature. Among other things, it shielded Petitioner's parents from the prosecution's questioning and, in any case, was reasonable since the parents provided scant alibi support--for the Sherin crimes Mrs. Morafates was hospitalized and Mr. Morafates merely saw Petitioner for a brief period in the morning of the rape; during the Cabo crimes, both

parents were in Florida.  (T2. 7249, 7322.)

Similarly, where Petitioner argues that trial counsel ineffectively failed to challenge the trial court's ruling that, if Petitioner's mother was to serve as an alibi witness, she must submit to pre-trial questioning, he cannot persuade the court that but for this error (assuming, but not holding, that it was one) there is a reasonable probability that the result of the proceeding would have changed.  Pet'r Mem. of Law, p. 22.  For he does not even begin to explain how her testimony likely would have raised a reasonable doubt as to the government's proof, which the Second Department found "overwhelming."

Petitioner's remaining criticisms of trial counsel are miscellaneous and desultory.  He complains of an overall lack of preparation, consultation, investigation, and failure to protect Petitioner's rights.  <u>See</u> Pet'r Mem. of Law, p. 24.  Mr. Giannini, according to Petitioner, did not communicate with Petitioner frequently enough and declined to consult Petitioner's previous counsel.  <u>Id.</u> at 25.  Again, even if the Court determined that Mr. Giannini manifested ineffective assistance in his decision to work without prior counsel and to confer less than frequently with Petitioner, Petitioner offers errors that do not establish a reasonable probability that the result of the proceeding would have been different had counsel done otherwise.  While he claims that Mr. Giannini failed to meet and confer with Petitioner prior to

45

trial, his allegations do not add up to such a complete breakdown in communications, see McKee, 649 F.2d at 931, as would render the Appellate Division's holding an unreasonable application of Strickland analysis.

XIV.  The Prosecutor's Summation Did Not Render the Trial Fundamentally Unfair

On direct review Petitioner argued that the prosecutor's summation inflamed the jury and maligned the defendant's character and that of his counsel as well as the defense.  The Second Department summarily ruled that this claim was either unpreserved, without merit or of harmless error.  Dolan, 2 A.D.2d at 747.  The question here is thus whether the Second Department's decision reflected an unreasonable application of Federal law as defined by the United States Supreme Court.

To establish a denial of constitutional due process owing to an inflammatory summation, it is not enough for Petitioner to show that "the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 180, 106 S. Ct. 2464 (1986).  Rather, he must demonstrate that the untoward remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  The specific closing statements to which Petitioner objects are treated seriatim.

First, petitioner urges the court to find constitutional

fault with the summation for its "send a message" theme. This was exemplified by the prosecutor's comment that "And when you do [return a guilty verdict], we ask you to come back and tell this defendant sitting here 'You are a rapist. You raped Mary Jean Sherin. You raped Debbie Cabo." (T2. 7629.) Those remarks, however, were immediately prefaced by the prosecutor's admonishment to the jury to consider all the evidence and circumstances and to follow the instructions of the court. (T2. 7628-29.) Petitioner also finds fundamental unfairness in the prosecution's decision to display before the jury a picture drawn by Deborah Cabo's six-year-old daughter. But the defense neither lodged an objection to the introduction into evidence of the drawing nor did it object to its use during summation.

Second, addressing the inconsistent testimony of Petitioner's stepfather, the prosecution also advised the jury "to consider all these facts when you judge the credibility of a witness, and I ask you to consider these facts when you judge the credibility of [Petitioner's stepfather], also the fact that he was a defense witness." (T2. 7634-36.) Petitioner asserted on direct appeal that this comment instructed the jury to discount this witness "solely" for being a defense witness.

Third, in support of his theory that he lacked a motive to rape the victims Petitioner's counsel offered that Petitioner was "a very sexually active young man" with a lot of girlfriends

who had sex "every day, several times a day." (T2. 7559.)
Petitioner objected to the prosecutor's response in summation that
"it is outrageous to compare consensual acts of intercourse to the
crime of rape." (T2. 7643.)

Fourth, Petitioner argued that the prosecutor improperly
inflamed the jury by using the word "nightmare" in connection with
the ordeal through which the victims went. Petitioner neglects to
mention that defense counsel first dubbed the victims' experiences
as "terrible nightmare[s]." (T2. 7622-24.) In an arguably
improper remark, the prosecutor labeled the Petitioner a "coward"
for the masks he wore during the crimes. (T2. 7686.) Relatedly,
the prosecutor concluded by saying that:

> "Mr. Dolan is just like one of those Greek
> actors. He wears a particular mask either to
> hide his identity either physically or
> personally. He wore one mask for Melissa
> Gardener. He wore one mask for Jennifer
> Santoro. He wore one mask for Mrs. Morafates,
> his mother, one mask for his stepfather, one
> mask for Michael Early, one mask for Paul
> Czumak, one mask for Deborah Cabo, one mask
> for Mary Jean Sherin, and he still wears
> another mask in court for you. (T2. 7692-93.)

By way of curative remarks, the court twice instructed
the jury that "what the attorneys will say to you is not in
evidence in this case" (T2. 7459, 7724) and that it was the
evidence that governed and not the comments made during summation.
(T2. 7633.)

Given the strength of the case against Petitioner, the

relative benignity of the prosecutor's remarks, and the curative instructions given to the jury on more than one occasion, the Court cannot conclude that the Second Department's decision was based on an unreasonable application of <u>Darden</u> and <u>Donnelly</u>.

XV. <u>The Trial Court's Charge Did Not Violate Petitioner's Constitutional Rights</u>

Petitioner argued on direct appeal that his right to due process was denied when the first trial court charged the jury prior to deliberations as follows: "There is no halfway business about it. The defendant is either entitled to leave the courtroom a free man or he should be convicted." (T2. 7225.)

Petitioner characterized this as an ill timed <u>Allen</u> charge, which stressed the absolute need for a verdict at the expense of the jurors' conscientiously held beliefs. The Second Department issued a summary denial, stating that it was either unpreserved, without merit or of harmless error. <u>Dolan</u>, 2 A.D.3d at 747. Thus the question becomes whether the Second Department's decision reflects an unreasonable application of Federal law as defined by the Supreme Court of the United States.

In a habeas proceeding, the standard of review of state jury instructions is "not whether the instruction is undesirable, erroneous or even universally condemned [but whether] the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973).

49

A single instruction to the jury is not to be viewed in isolation but rather in the context of the overall charge.  Id. at 147.

Petitioner's claim does not even make out an error, much less  one that infected the entire trial.  A so-called Allen charge is read when the trial court is given notice of a deadlock.  In such a situation the court must instruct the jurors not to surrender their conscientiously held beliefs.  See Allen v. United States, 164 U.S. 492, 501, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

Here since the instruction complained of was made prior to deliberation, the Allen claim is inapposite.  Instead, the judge instructed the jury on the meaning of deliberation.  Thus no issue of jury coercion to reach a verdict exists.

Accordingly the claim is denied.

XVI. <u>Petitioner's Constitutional Rights Were Not Violated By The</u>
     <u>Trial Court's Failure To Articulate Its Sentencing Reasoning</u>

Petitioner moved pro se pursuant to CPL § 440.20 to vacate his sentence on January 11, 2006 with the plea that the trial court failed to articulate its reasoning for sentencing Petitioner to the maximum term of imprisonment. (440.20 Motion, p. 3.) Unconvinced by Petitioner's argument that, though there was no requirement for the court to specify the sentencing factors relied on, the trial court should be so required, the County Court denied the motion.

The court held that: "Inasmuch as the sentence as imposed was completely authorized by statute, was not illegal, and was not invalid as a matter of law, the defendant's attack on the sentence pursuant to CPL § 440.20 must fail." (Order, p. 2.) On June 21, 2006 leave to appeal to the Appellate Division was denied.

Where a petitioner does not allege that the sentence fell outside the range prescribed by state law, he virtually always fails to state a constitutional claim. See <u>Underwood v. Kelly</u>, 692 F. Supp. 146 (E.D.N.Y. 1988), aff'd mem., 875 F.2d 857 (2d Cir. 1989).

Here Petitioner does not so allege, but rather mounts what is essentially a facial constitutional attack on New York state sentencing rules through a writ for habeas corpus.

Accordingly, Petitioner fails to establish how the Appellate Division's decision was either contrary to or an

unreasonable application of controlling federal authority as it existed at the time of the decision.

CONCLUSION

Petitioner's remaining claims, if any, are either unpreserved, without merit, or harmless error. For the reasons stated above, the Court DENIES Petitioner's writ of habeas corpus in its entirety. The Clerk of the Court is directed to mark this matter as CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      December 30, 2010
            Central Islip, New York